IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:09-cr-022-WKW |
| | ) | [wo] |
| MARTIN DEJESUS | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Pending before the Court are the Defendant's *Motion to Suppress* (Doc. 25, filed 4/22/09), *Supplement to Defendant's Motion to Suppress* (Doc. 29, filed 4/24/09), and the Government's *Response to Defendant's Motion to Suppress* (Doc. 33, filed 5/5/09). Defendant Martin DeJesus (hereinafter "DeJesus" or "Defendant") seeks to exclude the fruits from the search of his car on February 13, 2009. After the evidentiary hearing and due consideration of briefs, arguments, exhibits, and applicable law, the Magistrate Judge recommends that the District Court **DENY** the motion to suppress (Doc. 25).

### I.  FINDINGS OF FACT

On February 13, 2009, Trooper Charlton Martin"Martin" was traveling North on Interstate 65 near the 165 mile marker when he saw a Mazda Minivan in the lane beside him. Trooper Martin saw the minivan had a paper license plate but could not read the state of origin of the tag. Trooper Martin knew from his training and experience that paper tags are often forged and altered for a variety of reasons. As Trooper Martin walked up to the passenger side of the minivan he could see, at a distance of approximately 6 to 10 feet, that

the tag was purportedly a current Texas license plate.  The tag was made from white paper with a thickness between copier paper and construction paper, and had black letters and numerals.  Trooper Martin thought the tag was not authentic because it could easily be made by anyone with an ordinary printer.  To discern whether the tag was legitimate Trooper Martin asked the driver, Martin DeJesus "DeJesus," the sole occupant of the minivan, for his license, insurance, registration and ownership papers.

DeJesus was visibly shaking as he gave Trooper Martin the documents.  Trooper Martin could see the carotid artery pulse in DeJesus and he could see the shirt DeJesus wore move because of his rapid heartbeat.   DeJesus seemed to Trooper Martin more nervous than a motorist would be when stopped about the paper license plate.  DeJesus told Trooper Martin he was moving from Houston to Atlanta for work because there was no work available in Houston.  When Trooper Martin asked DeJesus about his new address and job, DeJesus claimed not to understand Trooper Martin.  DeJesus apparently understood Trooper Martin enough to say he was going to work in a restaurant in Atlanta.  Trooper Martin thought the situation was suspicious but he took the paperwork to his car and began to examine the documents.

The bill of sale for the van showed that DeJesus paid roughly $4,000.00 for the van 9 days prior.  Trooper Martin has extensive training in narcotics interdiction and serves as an instructor in interdiction.  The recent cash purchase stood out to Trooper Martin because DeJesus claimed he was moving to Atlanta to find work, yet he paid cash rather than finance the van.  In addition, Houston, Texas, is a major source city for narcotics and Atlanta is a

major southeastern hub for distribution of narcotics.  Trooper Martin saw there were a few clothes, recently dry cleaned, hanging in the car.  To Trooper Martin, the dry cleaned clothes were inconsistent with a person engaged in restaurant work and the amount of clothing was inconsistent with a person moving from one place to another.  Trooper Martin called the El Paso Intelligence Center (EPIC) to determine if they had any information about DeJesus.  EPIC told Trooper Martin there was an open investigation on DeJesus's involvement in a narcotics trafficking group.

Trooper Martin went back to the minivan and gave DeJesus his documents, along with a warning citation, and terminated the traffic stop.  Trooper Martin asked DeJesus in English and Spanish if he had any contraband in the car.  DeJesus said no.  Trooper Martin asked DeJesus in English and Spanish if he had any large sums of currency in the car or if he had a nail in the car.  DeJesus said no.  Trooper Martin asked if there was a nail in the car because it is a slang term to denote a vehicle which has a modified or hidden compartment suitable for hiding contraband.  In Trooper Martin's experience, a person not involved in smuggling contraband will usually have a puzzled look or ask Trooper Martin what he means regarding the nail.  DeJesus did not ask Trooper Martin to clarify and did not appear to Trooper Martin to misunderstand what Trooper Martin said to him.  Trooper Martin asked DeJesus in English and Spanish if he could search the minivan.  DeJesus said yes.  Trooper Martin gave DeJesus a Consent to Search form for Spanish speakers.  DeJesus read and signed the form.  Shortly after beginning the search of the car's exterior, Trooper Martin saw a pink substance which he recognized as Bondo, a body filler used in auto-repair.  Closer

inspection of the undercarriage led Trooper Martin to discover approximately 5 kilograms of cocaine in the rocker panels of the minivan.

On February 18, 2009, the Grand Jury for the Middle District of Alabama indicted DeJesus for the knowing possession with intent to distribute 5 kilograms or more of cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).  *See* Doc. 7.  On April 22, 2009, DeJesus filed his motion to suppress evidence discovered during the search. *See* Doc. 25.  DeJesus asserts four issues in his motion:

1)      Whether the stop and seizure was illegal because Sergeant Martin lacked reasonable suspicion and/or probable cause to stop the vehicle;

2)      Whether the alleged consent to search the vehicle removed the taint of the Fourth Amendment violation;

3)      Whether the search exceeded the scope of the consent; and

4)      Whether alleged selective enforcement of traffic laws (based upon defendant's Hispanic ancestry) compels suppression.

The United States responds the traffic stop was initiated for a legal purpose and DeJesus's consent to search was voluntary and legal.  The Court heard argument and received evidence from the parties on July 21, 2009.


## II.  DISCUSSION AND ANALYSIS

### A.  The Traffic Stop

DeJesus argues Trooper Martin had no reasonable suspicion to stop his car as he drove

on Interstate 65 in Alabama.  DeJesus asserts his car tag complies with applicable law in Texas, the state of registration, and therefore Martin's stop to investigate vehicle registration was unlawful, rendering any evidence seized inadmissible under the Fourth Amendment. Longstanding precedent clearly states that the "Fourth Amendment requires that searches and seizures be reasonable.  A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."  *City of Indianapolis v. Edmond*, 521 U.S. 32, 37, 121 S.Ct. 447, 451 (2000).  In support of the privacy rights motorists retain when operating their vehicles, the Supreme Court stated "[W]ere the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed." *Delaware v. Prouse*, 440 U.S. 648, 662-663, 99 S.Ct. 1391, 1401 (1979).  Notwithstanding DeJesus's right to be free from unreasonable search and seizure in his car, *Prouse* stated

> [A]ccordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered . . . stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Prouse, id.*  Whether Martin's stop met the parameters of *Prouse* is the question before the Court.

Alabama law provides motor vehicles on its public highways "shall at all times keep attached and plainly visible on the rear end of such motor vehicle a license tag or license plate as prescribed and furnished by the Department of Revenue at the time the owner or operator purchases his license." Ala.Code 1975 § 32-6-51.  Martin credibly testified he

"initiated a traffic stop for [the car] not displaying a state license plate, because the temporary plates like that are not reliable, as far as, you know, determining ownership or anything like that." (Tr. at 9). Martin then explained that DeJesus's plate was "just a piece of paper that you could print out, you know, on a - with your personal computer. You could, you know, make it up and print it out. And that's why I stopped it, because it's not a state license plate that could be checked through normal means." (Tr. at 9). The temporary license numbers were visible to Martin, but he could not make out an expiration date or the state of origin. (Tr. at 9-10). DeJesus's contention that his tag complied with the law of Texas is moot for purposes of the initial stop because Martin could not identify a state of origin, and therefore could not check the registration "through normal means." A stop was necessary to verify DeJesus's car was registered, and therefore lawfully operated in Alabama.

Two Eleventh Circuit opinions support Martin's decision to stop DeJesus for investigative purposes. In *United States v. Smith*, 164 Fed.Appx. 825 (11th Cir. 2006), the United States District Court for the Southern District of Alabama approved the stop of a car with a "car lot tag" where the police officer explained he "routinely" requested paperwork on such vehicles because it was the "only way" to verify the tag's legitimacy. *Smith*, 164 Fed.Appx. at 826. The district court found that because Smith's tag lacked "certain 'required markings,' including the date of issuance and expiration," it did not comply with Alabama law, and thus provided probable cause for the stop. *Id*. at 827. In *United States v. Jennings*, 280 Fed.Appx. 836 (11th Cir. 2008), officers stopped a car on their belief that an out-of-state temporary tag was expired or altered. The stop was deemed reasonable because the operation

of a car with an invalid tag would constitute a traffic violation. *Jennings*, 280 Fed.Appx. at 840, citing *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990) (police may stop a car "'[w]hen there is . . . probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.").

A third case, *United States v. Wright*, 2006 WL 3483503 (N.D.Fla. 2006), found a traffic stop was within the Fourth Amendment's bounds where the officer could not see the properly displayed temporary tag until he actually made the stop. Suppression in that case was granted when the officer saw the valid Florida temporary tag met statutory guidelines, and there was "no longer any reasonable suspicion to detain" the driver. *Wright*, at *4. The *Wright* decision also lists numerous decisions which emphasize reasonable suspicion lasts until the suspicion dissipates. *Id.* Finally, *United States v. Edgerton*, 438 F.3d 1043, 1051 (10th Cir. 2006), cited in *Wright*, attached a photograph of the defendant's car displaying the temporary tag which was the basis for a traffic stop. The decision found the stop was permissible up until the point where the officer "was able to read the Colorado tag and deem it unremarkable" by visual inspection. *Edgerton* also acknowledges the possible argument that defendant's nervousness, air freshener, and "energy drinks" may have provided reasonable suspicion of criminal activity, but that argument was not advanced by the government. *Edgerton, id.*

The Court finds Martin's decision to stop DeJesus was reasonable in light of these decisions by higher and sister courts. Despite the varied facts and results in *Smith*, *Jennings*,

*Wright*, and *Edgerton*, a finding of reasonable cause for a stop is constant where a temporary tag is clearly noncompliant with state law, or where a stop is necessary for the officer to determine validity.  In this case, although merely stopping DeJesus permitted Martin to view the state of origin and expiration, his decision to verify registration by scrutinizing DeJesus's documents is reasonable because the paper tag struck him as one which could have been printed on a personal computer.   Unlike the temporary tag in *Edgerton*, this tag was "remarkable" in that it looked like a document anyone could create, as opposed to one issued by a state agency.  While the Court is not the arbiter of what constitutes an "official-looking" temporary tag issued in Alabama or Texas, the tag in this case does indeed appear to be made by a home printer.  *See* Govt. Exhibit 1 - photograph of DeJesus's car with paper license (included with Recommendation as Attachment 1).  Consequently, Martin's decision to collect documentation, even after visual inspection of a facially valid tag, is reasonable. Martin also explained the need to "scrutinize" supporting documents due to increased instances of fraudulent documents.   The forgeries of documents are facilitated by technological advances and demand closer scrutiny by officers.

While collecting documents to confirm the validity of the tags, Martin engaged in conversation with DeJesus, which was permissible in this circuit because it did not prolong the detention.  *See United States v. Ramirez*, 476 F.3d 1231, 1237 n.11 (11th Cir. 2007). While talking with DeJesus, Martin saw that DeJesus was visibly shaking as he handed over his paperwork, had an exaggerated carotid pulse, and a heartbeat so strong that it caused his shirt to move.  These observations caused Martin to suspect criminal activity.  Martin also

learned DeJesus was moving to Atlanta to look for work, but noticed the small amount of personal and household belongings was not consistent with a move.  Martin also noticed DeJesus had been consuming a Red Bull energy drink, which he stated didn't mean "a whole lot" by itself, but when combined with other indicators, the likelihood that the driver is a drug trafficker increases.  Once the paperwork was in hand and Martin went to his car Martin found it odd that a person looking for work would have recently paid cash for a car.  These circumstances heightened Martin's suspicions that DeJesus was involved in criminal activity.

After Martin satisfied himself that the tag was consistent with DeJesus's purchase documents, and having received information from EPIC indicating DeJesus was involved in a narcotics trafficking group, he returned DeJesus's documentation and informed him the traffic stop was over.  While Martin was satisfied with the authenticity of the tags, nothing before the court proves the tag or the purchase and registration documents are authentic. Even if the tag and documents are authentic the Court finds that they look like documents a very simple printer could produce.

**B.  REASONABLE SUSPICION**

Under a restrictive reading of *Edgerton*, the Court finds that Trooper Martin made several observations which gave him reasonable cause to suspect criminal activity was afoot other than a possible license plate violation.  Martin could see from the tag that the car and presumably the driver were from Texas.  His review of DeJesus's license and vehicle documents confirmed he was from Houston, Texas.  From his training and experience, Trooper Martin knew Houston, Texas is a major source city for narcotics. Likewise, Trooper

Martin knew Houston, Texas is several hundred miles from Montgomery, Alabama. Whether Montgomery, Alabama or some point more distant was the ultimate destination of the car, the clothing displayed in pain view within the van was consistent with someone who was likely going to make a quick turnaround trip from their destination.  The Red Bull energy drink was consistent with someone who wanted to make no stops along the way to  their ultimate destination.

All of the foregoing, including the homemade looking tag on the car were grounds for Trooper Martin to reasonably suspect, at a minimum, the car might be stolen or that DeJesus was smuggling contraband.  The reasonable character of the suspicion becomes even stronger in light of the sliver of bondo which was on the side of the car in plain view had Trooper Martin chosen to make a closer inspection before asking DeJesus for his documents.  From the photograph, the minivan had no damage which would require bondo.  At the very least, the facts justify allowing Trooper Martin to ask further questions and conduct a minimal document review which might either allay his suspicions or cause him to inquire further. When Trooper Martin did inquire further after stopping the minivan and making his observations, DeJesus further raised the reasonable suspicions of Trooper Martin.  DeJesus had a sense of nervousness which made his hands shake; his carotid pulse begin to visibly throb; and his shirt began to move reflecting the rise in his heartbeat.  Trooper Martin knew from his conversation with DeJesus that his destination was Atlanta, Georgia, a place the DEA regards as the largest redistribution point for narcotics in the United States.

Martin testified his request for consent to search was based upon his cumulative

suspicions that criminal activity was afoot.  Although the "reasonable suspicion" standard is less demanding than probable cause, it must be more than an "inchoate and unparticularized suspicion or hunch."  *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989).  *Sokolow* directs courts to consider "the totality of the circumstances - the whole picture" when evaluating the validity of officers' actions.  490 U.S. at 7; *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990).  "The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same - and so are law enforcement officers."  *Sokolow, id*. at 8.  *See also United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005)(reaffirming officer's duty to investigate where reasonable suspicion exists).

Martin, a trained officer, used the totality of circumstances to make inferences and deductions "that might well elude an untrained person."  *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009), quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002).  The Eleventh Circuit also stated in *Bautista-Silva* that a "divide-and-conquer" approach to factual analysis is not required, and "reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation.'" *Bautista-Silva*, *id*. at 1272-73, quoting *Arvizu* at 267.  This court's review of the testimony leads it to find reasonable suspicion to search DeJesus's car.

### C.  CONSENT

DeJesus challenges the validity of the consent to search his car and the extent of the

search.  "An officer conducting a routine traffic stop may request consent to search the vehicle.  (Citations omitted.)  A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'" *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001).  A request for consent need not arise from any particular suspicion.  Therefore, even if Martin had not formed reasonable suspicion of criminal activity, his request for consent to search was still permissible.  A court's assessment of the voluntariness of consent "is factual and depends on the totality of the circumstances." *Id*. Circumstances to be considered are the use of coercive procedures, whether the exchange is cooperative in nature, and whether the defendant had everything he reasonably required to proceed on his journey.  *Ramirez* at 1240; *see also Purcell* at 1281 (including motorist's knowledge that he has the right to refuse consent).

First, DeJesus argues the allegedly invalid stop taints any consent.  The Court finds the stop was valid, therefore, this argument fails.  Next, he argues that his understanding of English put him at a disadvantage because he did not know what his rights were, and he still understood himself to be in a state of detention.  Martin's undisputed testimony contradicts this argument, as Martin asked DeJesus in Spanish for consent to search his car because the speed of DeJesus's positive response to the question in English caused Martin to question DeJesus's comprehension.  After Martin asked again in Spanish, DeJesus agreed, and Martin obtained his signature on a Spanish-language consent form.  Martin acknowledged he could only speak certain phrases in Spanish, and could not translate the Spanish form provided to him by the Alabama State Department of Public Safety.  Nonetheless, the actual contents of

the form are not in dispute, nor did DeJesus claim to be illiterate in his native language. Martin's use of Spanish to ask for consent a second time, and DeJesus's signature on a Spanish-language consent to search form, eviscerates this second argument.

The Court's application of the analysis for valid consent set forth in *Ramirez* and *Purcell* indicates there are no further grounds to challenge DeJesus's consent. Martin did not employ coercive techniques to get consent, DeJesus was cooperative, Martin had returned all paperwork, and it is unchallenged that the Spanish form, like its English counterpart, explained that he could refuse consent. *See United States v. Collins*, 2008 WL 2636571, *5 (M.D. Ala. 2008). Under this analysis, the Court finds DeJesus's consent was valid, and the ensuing search is likewise valid under the Fourth Amendment. DeJesus's argument that the search exceeded the scope of consent is unavailing, as the consent form did not limit the search to the interior of the car. Martin could see Bondo on the undercarriage of DeJesus's car, which Martin knew was used when cars were modified for the concealment of contraband. Martin's decision to further search that area of the car did not exceed the scope of the valid consent from DeJesus.

### D.  The Equal Protection Claim

Last, DeJesus claims his ethnicity improperly motivated Martin to search for grounds to search his vehicle, in violation of the Equal Protection Clause. *Whren* held "the Constitution prohibits selective enforcement of the law based on considerations such as race. The constitutional basis to object to the intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role

in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 516 U.S. at 813.  Thus, *Whren* requires this court look first for a reasonable basis for a traffic stop, and if found, an officer's subjective intentions are to be irrelevant.  The facts demonstrate a valid basis for the stop in this case, and there are no grounds to address DeJesus's equal protection claim within this suppression proceeding.  In fact, nothing credible is before the Court to suggest Trooper Martin did anything because DeJesus is Hispanic.

### III.  CONCLUSION

Pursuant to the foregoing findings and conclusions, it is the **RECOMMENDATION** of the Magistrate Judge that Defendant's *Motion to Suppress Evidence* and *Supplement* (Docs. 25 and 29) be **DENIED**.

It is further **ORDERED** that the parties shall file any objections to the said Recommendation not later than **August 20, 2009.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v.*

*Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 6th day of August, 2009.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE